**THIS PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED UNDER § 1125(b) OF THE BANKRUPTCY CODE BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION FOR USE IN CONNECTION WITH THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE JOINT PLAN OF REORGANIZATION DESCRIBED HEREIN.   ACCORDINGLY, THE FILING AND DISSEMINATION OF THIS PROPOSED DISCLOSURE STATEMENT ARE NOT INTENDED AND SHOULD NOT IN ANY WAY BE CONSTRUED AS A SOLICITATION OF VOTES ON THE JOINT PLAN, NOR SHOULD THE INFORMATION CONTAINED HEREIN BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THE PROPOSED DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **LA BOTA DEVELOPMENT** | § | **Case No. 10-20376** |
| **COMPANY, INC. and** | § | |
| | § | |
| **LAREDO ROCK TECH SAND &** | § | **Case No.  10-20377** |
| **GRAVEL, LP** | § | |
| | § | **Jointly Administered Under** |
| **Debtors.** | § | **Case No. 10-20376** |

**DISCLOSURE STATEMENT UNDER 11 U.S.C. § 1125**
**IN SUPPORT OF JOINT PLAN OF REORGANIZATION**
**OF LA BOTA DEVELOPMENT COMPANY, INC.**
**AND LAREDO ROCK TECH SAND & GRAVEL, LP**

**IMPORTANT**

**THIS DISCLOSURE STATEMENT IS SUBMITTED TO ALL CREDITORS OF THE DEBTORS, ENTITLED TO VOTE ON THE JOINT PLAN OF REORGANIZATION HEREIN DESCRIBED AND CONTAINS INFORMATION THAT MAY AFFECT YOUR DECISION TO ACCEPT OR REJECT THE DEBTORS' JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE U.S. BANKRUPTCY CODE. THIS DISCLOSURE STATEMENT IS INTENDED TO PROVIDE ADEQUATE INFORMATION AS REQUIRED BY THE BANKRUPTCY CODE AS TO THE DEBTORS' JOINT PLAN OF REORGANIZATION.   ALL CREDITORS AND INTEREST HOLDERS ARE URGED TO READ THE DISCLOSURE STATEMENT AND ATTACHMENTS WITH CARE AND IN THEIR ENTIRETY. ON _____ THE BANKRUPTCY COURT APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION UNDER §1125(b) OF THE BANKRUPTCY CODE.  SOLICITATION OF ACCEPTANCE OR REJECTION OF THE JOINT PLAN OF REORGANIZATION HEREIN DESCRIBED AND ATTACHED AS EXHIBIT "10" IS BEING SOUGHT FROM CREDITORS AND**

INTEREST HOLDERS WHOSE CLAIMS AGAINST, AND INTEREST IN THE DEBTORS ARE IMPAIRED UNDER THE JOINT PLAN OF REORGANIZATION. CREDITORS AND INTEREST HOLDERS ENTITLED TO VOTE ON THE JOINT PLAN OF REORGANIZATION ARE URGED TO VOTE IN FAVOR OF THE JOINT PLAN AND TO RETURN THE BALLOT INCLUDED WITH THIS DISCLOSURE STATEMENT UPON COMPLETION IN THE ENVELOPE ADDRESSED TO ATTENTION: WAYNE KITCHENS, HUGHES WATTERS ASKANASE, L.L.P., THREE ALLEN CENTER, 333 CLAY, 29TH FLOOR, HOUSTON, TEXAS 77002, NO LATER THAN _____.

A HEARING TO CONSIDER THE DEBTORS' JOINT PLAN OF REORGANIZATION IS SET FOR _____ AT _____ ____.M., IN THE HONORABLE RICHARD S. SCHMIDT'S COURT, 1133 N. SHORELINE BLVD., CORPUS CHRISTI, TEXAS 78401.

_____, IS FIXED AS THE LAST DAY FOR FILING AND SERVING WRITTEN OBJECTIONS TO THE DISCLOSURE STATEMENT

La Bota Development Company, Inc. ("*La Bota*") and **Laredo Rock Tech Sand & Gravel, LP** ("*Rock Tech*") **(collectively, the "*Debtors*")** file this Disclosure Statement, (the "*Disclosure Statement*"), pursuant to 11 U.S.C. § 1125 in Support of the Joint Plan of Reorganization proposed by Debtors.

*/s/ Wayne Kitchens*
Wayne Kitchens          TBN 11541110
wkitchens@hwa.com
Steven Shurn           TBN 24013507
sshurn@hwa.com
Simon Mayer            TBN 24060243
smayer@hwa.com
HUGHESWATTERSASKANASE, LLP
333 Clay Street, 29th Floor
Houston, Texas 77002
Tel: 713.759.0818
Fax: 713.759.6834
**COUNSEL FOR DEBTORS**

# ARTICLE I – INTRODUCTION

### A.    General Information Concerning The Disclosure Statement and Joint Plan.

The Debtors submit this Disclosure Statement under Section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 to all of the Debtors' known Creditors.  The purpose of this Disclosure Statement is to disclose information adequate to enable Creditors who are entitled to vote to arrive at a reasonably informed decision in exercising their rights to vote on the Plan of Reorganization proposed by La Bota and the Plan of Reorganization proposed by Rock Tech (collectively the "Joint Plan").  A copy of the Joint Plan is attached as Exhibit "10".  Capitalized terms used but not defined in this Disclosure Statement shall have the meanings assigned to them in the Joint Plan or in the Bankruptcy Code and Bankruptcy Rules.  All section references in this Disclosure Statement are to the Bankruptcy Code, unless otherwise indicated.

The Debtors have promulgated their Joint Plan consistent with the provisions of the Bankruptcy Code.  The purpose of the Joint Plan is to provide the maximum recovery to each Class of Claims and Equity Interest considering the assets and anticipated funds available for distribution to Creditors and the Equity Interest Holder.  The Debtors believe that the Joint Plan permits the maximum recovery for all Classes of Claims and Equity Interest.

This Disclosure Statement is not intended to replace a careful review and analysis of the Joint Plan, including the specific treatment of claims and Equity Interest under the Joint Plan.  It is submitted as an aid and supplement to your review of the Joint Plan to explain the terms of the Joint Plan.  Every effort has been made to explain fully various aspects of the Joint Plan as they affect Creditors and the Equity Interest Holder.  If any questions arise, the Debtors urge you to contact counsel for the Debtors and they will attempt to resolve your questions.  You may, of course, wish to consult with your own counsel.

### B.    Disclaimer.

NO SOLICITATION OF VOTES HAS BEEN OR MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND §1125 OF THE BANKRUPTCY CODE, AND NO PERSON HAS BEEN AUTHORIZED TO USE ANY INFORMATION CONCERNING THE DEBTORS TO SOLICIT ACCEPTANCES OR REJECTIONS OF THE JOINT PLAN OTHER THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.  CREDITORS AND EQUITY INTEREST HOLDERS SHOULD NOT RELY ON ANY INFORMATION RELATING TO THE DEBTORS OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED.

EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS, NO REPRESENTATION CONCERNING THE DEBTORS, THEIR ASSETS, PAST OR FUTURE OPERATIONS, OR CONCERNING THE JOINT PLAN IS AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE JOINT PLAN.  ANY REPRESENTATIONS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE JOINT PLAN OTHER

THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE REPORTED TO COUNSEL FOR THE LA BOTA DEVELOPMENT COMPANY, INC. AND LAREDO ROCK TECH SAND & GRAVEL, WAYNE KITCHENS, HUGHES WATTERS ASKANASE, L.L.P., THREE ALLEN CENTER, 333 CLAY, 29TH FLOOR, HOUSTON, TEXAS 77002.

UNLESS ANOTHER TIME IS SPECIFIED, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF. NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE CONCERNING THE DISCLOSURE STATEMENT AND THE JOINT PLAN SHALL UNDER ANY CIRCUMSTANCES IMPLY THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE OF THE DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARATION OF THE DISCLOSURE STATEMENT WERE COMPILED.

WHILE THE INFORMATION PROVIDED HEREIN IS BELIEVED RELIABLE, THE DEBTORS HAVE NOT UNDERTAKEN TO VERIFY OR INVESTIGATE SUCH INFORMATION, AND MAKE NO REPRESENTATION AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION.

DISTRIBUTION OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS ANY REPRESENTATION OR WARRANTY AT ALL, EITHER EXPRESSED OR IMPLIED, BY THE DEBTORS, OR THEIR RESPECTIVE PROFESSIONAL CONSULTANTS THAT THE JOINT PLAN IS FREE FROM RISK, THAT THE ACCEPTANCE OF THE JOINT PLAN WILL RESULT IN A RISK-FREE RESTRUCTURING OF THE DEBTORS' OBLIGATIONS OR THAT THE OBLIGATIONS OF THE DEBTORS AS RESTRUCTURED BY THE JOINT PLAN WILL BE FULLY PERFORMED IN THE FUTURE WITHOUT RISK OF FURTHER DEFAULT.

THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE JOINT PLAN OR A GUARANTEE OF THE ACCURACY OR THE COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT AND THE JOINT PLAN ATTACHED SHOULD BE READ IN THEIR ENTIRETY BEFORE VOTING ON THE JOINT PLAN. FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND EQUITY INTEREST, THE TERMS OF THE JOINT PLAN ARE SUMMARIZED IN THIS DISCLOSURE STATEMENT, BUT ALL SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THE JOINT PLAN, WHICH CONTROLS IN CASE OF ANY INCONSISTENCY.

    C.    *Answers to Commonly Asked Questions.*

As part of the Debtors' efforts to inform Creditors regarding the Joint Plan and the plan

confirmation process, the following summary provides answers to questions, which parties who receive a disclosure statement often ask.

**THE FOLLOWING SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE JOINT PLAN, WHICH CONTROLS IN CASE OF ANY INCONSISTENCY.**

      **1.**      **Who are the Debtors?**

La Bota, a Texas corporation, is a real estate development company that owns and sells residential and commercial real estate to developers. It also owns a mobile home park in Nueces County, Texas and a mini-storage facility in Harris County, Texas. Rock Tech, a Texas limited partnership, mines, extracts and sells sand and gravel in Webb County, Texas.

      **2.**      **What is a Chapter 11 bankruptcy?**

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code that allows financially distressed businesses and individuals to reorganize its debts. The commencement of a Chapter 11 case creates an estate containing all the legal and equitable interests of the debtor in property as of the date the petition is filed. Sections 1101, 1107 and 1108 of the Bankruptcy Code provide that a debtor may continue to operate the debtor's business as a debtor-in-possession. La Bota remains in possession of its assets. Rock Tech remains in possession of its assets. When a Chapter 11 bankruptcy case is filed, creditors are prohibited from attempting to collect debts or enforce liens against the debtor or its assets without first obtaining approval from the Bankruptcy Court.

      **3.**      **If the Joint Plan governs how my claim is treated, what is the Disclosure Statement?**

The Bankruptcy Code requires that a debtor solicit acceptances and rejections of a proposed plan from creditors and shareholders whose claims and interests are impaired before the Bankruptcy Court can confirm the plan. Before a debtor may solicit acceptances of a plan, however, the Bankruptcy Court must approve a disclosure statement and determine that the disclosure statement contains information adequate to allow creditors and shareholders to make an informed judgment about the plan. The disclosure statement and the plan are formally distributed after the Bankruptcy Court approves the disclosure statement. At that time, creditors and shareholders also receive a voting ballot with the disclosure statement and plan.

      **4.**      **Has the Disclosure Statement been approved by the Bankruptcy Court?**

Yes. On _____, the Bankruptcy Court approved this Disclosure Statement as containing adequate information. "Adequate information" means information of a kind, and in sufficient detail, as far as is practicable considering the nature and history of the Debtors and the condition of La Bota's books and records and Rock Tech's books and records to enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant classes to make an informed judgment whether to vote to accept or reject the Joint Plan. The Bankruptcy

Court's approval of this Disclosure Statement does not constitute an endorsement of any of the representations contained in either the Disclosure Statement or the Joint Plan.

### 5.    How do I determine how my Claim or Interest is classified?

To determine the classification of your Claim, you must first determine the nature of that claim or interest.  Under the Joint Plan, claims and interests are classified into a series of Classes.  The pertinent sections of the Disclosure Statement and Joint Plan disclose, among other things, the members of each particular Class, the size of each Class, what you will receive from your Claim or Equity Interest if the Joint Plan is confirmed, and when you will receive such consideration if the Joint Plan is confirmed.  ***Attached as Exhibits "1"and "4" are excerpts from La Bota's and Rock Tech's Schedules showing claims.  If you have filed a timely Proof of Claim to which no Claim Objection is filed, or your claim is scheduled, and not scheduled as disputed, un-liquidated or contingent, your claim will be allowed without further action. You should carefully examine Exhibits "1"and "4".  If your Claim is not listed or if it is listed in a manner that is incorrect, you may be required to take immediate legal action to protect your rights.  You may wish to consult an attorney to protect your rights.***  The Debtors reserve the right to amend their respective Schedules.

### 6.    Why is confirmation of the Joint Plan important?

The Bankruptcy Court's confirmation of the Joint Plan is a condition to the Debtors' right to carry out treatment of creditors and shareholders under the Joint Plan.  Unless the Joint Plan is confirmed, and any other conditions to confirmation or to the effectiveness of the Joint Plan are satisfied, the Debtors are legally prohibited from satisfying Claims or Equity Interests as provided in the Joint Plan.

### 7.    What is necessary to confirm the Joint Plan?

Under applicable provisions of the Bankruptcy Code, confirmation of La Bota's plan and Rock Tech's plan requires, among other things, that at least one class of impaired Claims or Interests vote to accept such plan.  Acceptance by a class of claims means that at least two-thirds in the total dollar amount and more than one-half in number of the allowed claims actually voting in the class vote in favor of the plan.  Because only those claims or interests who vote on a plan will be counted for purposes of determining acceptance or rejection of a plan by an impaired class, a plan can be approved with the affirmative vote of members of an impaired class who own less than two-thirds in amount and one-half in number of the claims.  Besides acceptance of the plan by each class of impaired creditors or interests, a bankruptcy court also must find that a plan meets a number of statutory tests before it may confirm the plan.  These requirements and statutory tests generally are designed to protect the interests of holders of impaired claims or interests that do not vote to accept a plan but who will nonetheless be bound by a plan's provisions if a Bankruptcy Court confirms a plan.  If one or more classes vote to reject a plan, the Debtors may still request that the Bankruptcy Court confirm a plan under Section 1129(b).  To confirm a plan not accepted by all classes, the Debtors must demonstrate that the plan does not discriminate unfairly, and is fair and equitable with respect to each class of claims or interests that is impaired under, and that has not accepted, the plan.  This method of

confirming a plan is commonly called a "cramdown".  In addition to the statutory requirements imposed by the Bankruptcy Code, the Joint Plan itself also provides for certain conditions that must be satisfied as conditions to confirmation.

### 8.        Is there a Creditors' Committee?

Pursuant to provisions of the Bankruptcy Code, the Office of the United States Trustee may appoint a Creditor's Committee if creditors elect to serve in that capacity.  No creditor's committee has been formed in either Rock Tech's or La Bota's bankruptcy case.

### 9.        When is the deadline for returning my ballot?

The Bankruptcy Court has directed that, to be counted for voting purposes, your ballot must be received by the Debtors no later than 5:00 p.m., Houston Time, on _____ ("**_Bar Date_**").

**IT IS IMPORTANT THAT ALL IMPAIRED CREDITORS VOTE ON THE JOINT PLAN.  THE DEBTORS BELIEVE THAT THE JOINT PLAN PROVIDES THE BEST POSSIBLE RECOVERY TO CREDITORS.  THEREFORE, THE DEBTORS BELIEVE THAT ACCEPTANCE OF THE JOINT PLAN IS IN THE BEST INTEREST OF CREDITORS AND RECOMMENDS THAT ALL IMPAIRED CREDITORS VOTE TO ACCEPT THE JOINT PLAN.**

### 10.        Voting Instructions

Ballots.  Ballots will be distributed only to holders of Claims which are impaired.  To determine whether your claim is impaired please refer to the Articles III, IV and V of the Joint Plan.  To be counted, ballots must be marked, noting acceptance or rejection of the Plan, and providing address and claim information reflected on the ballot form, **AND RETURNED SO AS TO BE RECEIVED NO LATER THAN _____ P.M., _____, 2010, AT THE FOLLOWING ADDRESS:**

**WAYNE KITCHENS
HUGHES WATTERS ASKANASE, L.L.P.
333 CLAY, SUITE 2900
HOUSTON, TEXAS  77002**

Ballots which are not properly completed or which are received after the deadline provided above shall not be counted in computing the vote on the Plan.

### ARTICLE II – OVERVIEW OF THE JOINT PLAN

An overview of the Joint Plan is set forth below.  This overview is qualified in its entirety by reference to the Joint Plan, a copy of which is attached as Exhibit "10" to the Disclosure Statement.  If the Court confirms the Joint Plan, and in the absence of any applicable stay, and all other conditions set forth in the Joint Plan are satisfied, the Joint Plan will take effect on the Effective Date – i.e. on or before the twenty-first (21st) day following the date upon which the

Confirmation Order becomes a Final Order.

As demonstrated in the attached Joint Plan, the Debtors propose full and complete satisfaction of all indebtedness owed by the Debtors through the Joint Plan.

While in the interest of convenience for all creditors and parties-in-interest, La Bota and Rock Tech have filed a joint plan and disclosure statement, confirmation of each Debtor's plan is independent of the confirmation of the others Debtor's plan.

### A.     La Bota

The Joint Plan provides for the continued operation of La Bota by current management and distribution in satisfaction of Creditor's Allowed Claim.  On the Effective Date, all property of La Bota's bankruptcy estate not otherwise distributed shall vest in La Bota, as the reorganized debtor.   The Confirmation Business of La Bota will thereupon be managed by current management.  All duties of La Bota's Estate, under the Joint Plan, will be performed and/or supervised by current management.  The Confirmation Business operations of La Bota will continue without further notice or Bankruptcy Court approval.  The current management, on behalf of La Bota, will be authorized to operate La Bota's business and post-confirmation business affairs.

As of the Effective Date of the Joint Plan, La Bota serving as the Disbursing Agent, shall be responsible for all payments and distributions to be made under the Joint Plan to the holders of Allowed Claims against La Bota, together with any payments, which become due under any executory contract or unexpired lease assumed by La Bota and other normal operational expenses incidental to the Confirmation Business.  Each executory contract and unexpired lease to which La Bota is a party shall be deemed rejected unless La Bota expressly assumes a particular executory contract or lease either prior to the Effective Date, or through its plan.

### B.     Rock Tech

The Joint Plan provides for the continued operation of Rock Tech by current management and distribution in satisfaction of Creditor's Allowed Claim.  On the Effective Date, all property of Rock Tech's bankruptcy estate not otherwise distributed shall vest in Rock Tech, as the reorganized debtor.   The Confirmation Business of Rock Tech will thereupon be managed by current management.  All duties of Rock Tech's Estate, under the Joint Plan, will be performed and/or supervised by current management.  The Confirmation Business operations of Rock Tech will continue without further notice or Bankruptcy Court approval.  The current management, on behalf of Rock Tech, will be authorized to operate Rock Tech's business and post-confirmation business affairs.

As of the Effective Date of the Joint Plan, Rock Tech serving as the Disbursing Agent, shall be responsible for all payments and distributions to be made under the Joint Plan to the holders of Allowed Claims against Rock Tech, together with any payments, which become due under any executory contract or unexpired lease assumed by Rock Tech and other normal operational expenses incidental to the Confirmation Business.   Each executory contract and

unexpired lease to which Rock Tech is a party shall be deemed rejected unless Rock Tech expressly assumes a particular executory contract or lease either prior to the Effective Date, or through its plan.

## ARTICLE III – NATURE OF CHAPTER 11 REORGANIZATION

Chapter 11 of the Bankruptcy Code (hereinafter "*Code*") is a remedial statute designed to effectuate the rehabilitation and reorganization of financially distressed individuals and entities. The statutory aims of a reorganization proceeding include:

A.   Preservation of both La Bota's and Rock Tech's going concern of value;

B.   Avoidance of a liquidation of the Debtors' assets;

C.   The protection of the interest of creditors, both secured and unsecured; and,

D.   The restructuring of the debts of the Debtors and, the finances of the Debtors, such as would enable it to retain those assets necessary to rehabilitate the corporate financial structure and, simultaneously therewith, produce the greatest recovery for its creditors.  The formulation and confirmation of a plan is the principal function of a Chapter 11 Case.  Such a plan normally includes provisions for:

1.   Altering or modifying rights of creditors;

2.   Dealing with or disposing of property of the Debtors;

3.   Paying the costs and expenses of administering the Chapter 11 Estates; and

4.   Execution of the Joint Plan.

The Joint Plan may effect the interest of all parties and creditors, reject executory contracts, and provide for prosecution or settlement of claims belonging to the Debtor(s).  In order to be confirmed by the Court, the Code requires that there be a finding that the plan received votes of certain requisite Classes and that the plan be "fair, equitable, and feasible", as to any dissenting Classes of Creditors.

In order for a plan to be "fair and equitable," it must comply with the "Absolute Priority" rule, which requires that each class of creditors, beginning with the most senior class, receive, in descending order, full and complete compensation in their respective allowed amounts before inferior or junior classes may participate in the distribution.

## ARTICLE IV – HISTORICAL BACKGROUND OF THE DEBTORS

### A.   *The History of La Bota Development Company, Inc. and Laredo Rock Tech*

### Sand & Gravel, LP:

La Bota Development Company, Inc., was incorporated in the State of Texas on August 25, 1981 by Albert F. Muller, Jr. La Bota was originally created to develop and manage the Muller family land holdings. The Muller family can trace its ownership in the property back to the original Spanish land grant in the 1700s. Albert F. Muller, Jr. started La Bota with the goal of being a good steward of the land, a promise he made to his father. Originally, Albert F. Muller, Jr. used a portion of the property to build two industrial subdivisions near the bridge connecting Laredo to Nuevo Laredo, Mexico. In keeping with his stewardship promise, Albert F. Muller, Jr. sought to give back to the City of Laredo by developing a safe and affordable residential community. Using the money earned from those projects, La Bota began investing and developing its properties into residential subdivisions. This community was eventually named La Bota Ranch. At the time subdivisions and residential areas in the Laredo area lacked certain amenities, which Albert F. Muller, Jr. thought were necessary to create a true community. As such, La Bota began developing La Bota Ranch with enhancements such as parks, pools and nature trails. La Bota also enclosed its community and installed gates and security at its entrances to provide its future residents with a sense of community and safety. At the time no other communities in Laredo had such amenities.

During the intervening years, to finance the development of the infrastructure necessary to build La Bota Ranch's numerous subdivisions, La Bota entered into a number of loans with various financial institutions. Because the City of Laredo lacks utility districts, La Bota was forced to finance the infrastructure development of La Bota Ranch itself. These monies were used to lay the necessary infrastructure such as water, natural gas, electricity, sewer, cable and telephones. Additionally, these monies were used to build the security facilities at the entrance to La Bota Ranch. Prior to opening a new subdivision to builders, La Bota would obtain financing and construct the necessary infrastructure. As properties sold to builders, La Bota would pay down its infrastructure loans. At one point in time the total amount owed for infrastructure development was almost $20 million. La Bota, through development and the sale of residential lots, has been able to reduce the debt on the infrastructure loans to approximately $10.8 million.

In an effort to diversify its investments, La Bota began purchasing and or creating other income producing properties around the state of Texas. In 2007, La Bota identified an area of its property, that while not suitable for residential development, was optimal for the mining of sand and gravel. Sand and gravel is widely used to create aggregate, a key component in the manufacture of concrete. To take advantage of the deposits, La Bota invested in the creation of Laredo Rock Tech Sand & Gravel, LP ("***Rock Tech***"). Over the intervening years, Rock Tech has grown into one of the top three aggregate producers in the Laredo area. The sand and gravel deposit is located on land owned by La Bota. Because of its substantial ownership interest in Rock Tech, La Bota is a guarantor on many of Rock Tech's loans.

Also in 2007, La Bota purchased the Houston mini storage facility located at 12835 East Freeway, Houston Texas (the "***Mini Storage***"). Given the location and historical occupancy rate, the Mini Storage has proven to be a strong investment for La Bota and a consistent supply of cash flow for the company.

Continuing to diversify its investments, in 2008 La Bota also purchased a mobile home park located in Robstown, Texas (the "***Park***").  Like the Mini Storage, the Park has provided a fairly consistent source of income for La Bota.

### B.   Secured Debt:

Bank MidWest, N.A.:  Bank MidWest, N.A. ("***BMW***") asserts a first lien on La Bota's following real property:

- Tract "B": 30 acres 4300 Maquilla LP Laredo Texas ("***Tract B***");
- Tract "C": 7.35 acres 14300 Mines Rd Laredo Texas ("***Tract C***");
- Tract "K": 8.6 acres Laredo Texas Webb County ("***Tract K***");
- 529.85 acres Laredo Texas Webb County ("***529 Acre Tract***"); and
- 65.9 acres Rock Tech Laredo Texas Webb County ("***Tract SG***").

Additionally, BMW asserts a second lien on La Bota's following real property:

- 72 Single Family Lots, La Bota Ranch Laredo Texas ("***72 Single Family Lots***"); and
- Tract "L": 61.11 acres Laredo Texas Webb County ("***Tract L***").

In September 2003, BMW and La Bota entered into a $2,887,500.00 promissory note ("***Note I***").  In January 2008, BMW and La Bota entered into a Loan Modification and Extension Agreement, where the Note I amount was increased to $3,400,000.00.  Pursuant to the Loan Modification and Extension Agreement, Note I's maturity date is September 10, 2014.  Also in September 2003, BMW and La Bota entered into a $1,237,500.00 promissory note ("***Note II***").  In January 2008, BMW and La Bota entered into a Loan Modification and Extension Agreement, where the Note II amount was increased to $1,472,000.00.  Pursuant to the Loan Modification and Extension Agreement, Note II's maturity date is September 24, 2014.  In December 2005, BMW and La Bota entered into a $7,484,695.00 promissory note ("***Note III***") (collectively with Note I and Note II, the "***Land Loans***").  In January 2008, BMW and La Bota entered into a Loan Modification and Extension Agreement for Note III.  Pursuant to the Loan Modification and Extension Agreement, Note III's maturity date is December 10, 2010.  According to its Schedules, La Bota's current indebtedness to BMW on the Land Loans is $10,886,303.00.

Additionally, BMW asserts a first lien on Rock Tech's following personal property:

- Komatsu Excavator PC400LC-7L;
- 2003 Terex Articulated Truck Model TA-30;
- Komatsu Wheel Loader WA450-5;
- Wash Plant and Conveyors, as further described in BMW's proof of claim;
- BNNT Cornell Pump;
- Solids Handling Vac-Assisted Pump;
- Skid Mounted Unit Complete with 1500 Hp/1800/405TS;
- TEFC Motor;

- Siemens 150 HP Soft 5; and
- NEMA 3R Enclosure (collectively, the "***Rock Tech Equipment***")

In May 2007, BMW and Rock Tech entered into a $500,000.00 promissory note ("***Working Capital Loan***").  In August 2008, BMW and Rock Tech entered into a Loan Modification Agreement for the Working Capital Loan.  Pursuant to the Loan Modification Agreement, the Working Capital Loan's maturity date was May 13, 2010.  In June 2007, BMW and Rock Tech entered into a $205,506.00 promissory note ("***RT Note I***") for the purchase of the Komatsu Excavator.  RT Note I's maturity date is June 18, 2014.  In July 2007, BMW and Rock Tech entered into a $148,000.00 promissory note ("***RT Note II***") for the purchase of the Terex Truck TA-30.  RT Note II's maturity date is July 16, 2014.  In August 2007, BMW and Rock Tech entered into a $141,646.00 promissory note ("***RT Note III***") for the purchase of the Komatsu Wheel Loader.  RT Note III's maturity date is August 23, 2014.  Also in August 2007, BMW and Rock Tech entered into a $440,857.58 promissory note ("***RT Note IV***") for the purchase of various collateral including the Wash Plant and Conveyors.  RT Note IV's maturity date is August 23, 2014.  Lastly, in August 2007, BMW and Rock Tech entered into a $34,993.98 promissory note ("***RT Note V***") (collectively with RT Note I, RT Note II, RT Note III, and RT Note IV, the "***Equipment Loans***") for the purchase of the BNNT Corrnell Pump and other related equipment .  RT Note V's maturity date is August 23, 2014.  La Bota entered into a Commercial Guaranty with BMW with respect to the Working Capital Loan (the "***Commercial Guaranty***").  According to its Schedules, Rock Tech's current total indebtedness to BMW on the Working Capital Loan is $502,492.57 and on the Equipment Loans is $903,971.60.

First National Bank:  First National Bank ("***FNB***") asserts a first lien on La Bota's following real property:

- 72 Single Family Lots; and
- Tract L.

In June 2008, FNB and La Bota entered into a $1,765,556.57 promissory note (the "***1.7M Note***").  FNB Note's maturity date is June 26, 2010.  According to its Schedules, La Bota's current indebtedness on the 1.7M Note is approximately $1,600,000.00.

A Discount Mini Storage II, Ltd.:  A Discount Mini Storage II, Ltd. ("***DMS***") asserts a first lien on La Bota's following real property:

- 12835 East Fwy, Houston, TX 77015.

In August 2008, DMS and La Bota entered into a $120,000.00 promissory note ("***120k Note***").  120k Note's maturity date is July 2015.  According to its Schedules, La Bota's current indebtedness on the 120k Note is $118,000.00.

Integrated Vehicle Leasing (a/k/a New World Financing):  Integrated Vehicle Leasing ("***IVL***") asserts a first lien on La Bota's following personal property:

- 1999 4000 gal. Water Truck.

In January 2006, IVL and La Bota entered into a Business Open-End Motor Vehicle Lease in which La Bota agreed to pay IVL $1,347.34 for 59 months to lease the 1999 4000 Ga. Water Truck (the "***Lease***").  At the end of the Lease's term, La Bota has the option to purchase the 1999 4000 Ga. Water Truck for $1.00.   According to its Schedules, La Bota's current indebtedness on the Lease is $8,085.12.

The Taxing Authorities:  While La Bota scheduled various taxing authorities' claims as Unsecured Priority Claims, all of the taxing authorities filed secured proof of claims. According to the proofs of claims filed, the taxing authorities assert that La Bota's total secured tax liability is $72,078.55; however, it appears that this figure includes both 2009 and 2010 taxes.  Moreover, $34,245.60 of the taxes asserted by the taxing authorities lacks sufficient documentation to determine whether the alleged taxes are for either 2009 or 2010.  On its Schedules, La Bota listed its priority tax liability as $28,706.81 for 2009.

### C.    *Debtors' Financial Condition and Reasons for Filing Chapter 11.*

La Bota's financial situation deteriorated due to several factors, including the recent mortgage meltdown and the subsequent lending freeze.   In 2005, in accordance with a requirement from its new primary lender, BMW, La Bota entered an exclusive sales agreement with a national homebuilder.  Shortly thereafter, the first signs of the collapse of the mortgage market began to appear.  The national homebuilder, feeling pressure from its exposure to the markets on the east and west coasts, began to miss certain closing deadlines.  Because the closing deadlines were missed, La Bota slowly began falling behind on certain payments on its infrastructure and other loans.  When La Bota requested that the national homebuilder release the properties, so La Bota could sell them to smaller regional builders, the national builder refused. It was not until late 2008, that the national homebuilder agreed to release the properties under contract.  However, by that time the mortgage crisis was fully developed and both local and national financial institutions stopped lending.  Thus, there were no longer any local builders able to obtain financing for construction.

Additionally, in 2008, a title company holding approximately $500,000.00 of La Bota's money went out of business.  One of the executive officers of the title company subsequently misappropriated approximately $700,000.00 of funds that had been in the title company's trust accounts, including La Bota's $500,000.00.   La Bota was eventually able to recover approximately $120,000.00 of those monies.

La Bota, leveraging the money it recovered, its other investments and single lot sales, was able to maintain the payments on its infrastructure loans for some time.  However, it had trouble making the principal payment on its primary infrastructure loan.  Moreover, since BMW pre-petition was unwilling to restructure the loan agreement to account for the recent turmoil in the markets, La Bota was forced to file for Chapter 11 bankruptcy protection.

Because all of Rock Tech's indebtedness to BMW was cross-collateralized with La Bota's indebtedness to BMW, Rock Tech also filed for bankruptcy protection contemporaneously with La Bota.  This was also reasonable given La Bota's substantial

ownership interest in Rock Tech and the fact that Rock Tech operates on real property owned by La Bota.

### D.    Ownership.

The ownership structure of La Bota is as follows: (i) Albert F. Muller Jr. – 50% and (ii) Virginia C. Muller – 50%, The ownership structure of Rock Tech is as follows: (i) Mariposa Group LLC – 1%, (ii) La Bota Development Company, Inc. – 79%, (iii) Albert F. Muller III – 10%, and (iv) Greg Ebe – 10%.

### E.    Debtors' Financial Information.

La Bota and Rock Tech have filed their respective bankruptcy schedules with the Bankruptcy Court, which are available for inspection at the office of the Clerk of the Court. La Bota and Rock Tech have filed their Monthly Operating Reports, ("MOR"), which are attached hereto as Exhibits "2" and "5" respectively.

## ARTICLE V – PRESENT FINANCIAL CONDITIONS/PROPERTY VALUATIONS

Information regarding the assets and the financial condition of La Bota and Rock Tech are exhibited by the following:

1.    Excerpts from La Bota's Schedules filed within these proceedings attached as Exhibit "1";

2.    La Bota's May 2010 through July 2010 Monthly Operating Reports attached as Exhibit "2";

3.    Excerpts from Rock Tech's Schedules Filed with these proceedings attached as Exhibit "4"; and

4.    Rock Tech's The May 2010 through July 2010 Monthly Financial Reports attached as Exhibit "5".

Information regarding the current valuation of La Bota's real property is listed below:

| Parcel | Description | Value |
|--------|-------------|-------|
| Tract A | 3.01 acres Mines Rd. and ITC Pky, Laredo, Texas | $1,245,000.00 |
| Tract B | 30 acres 4300 Maquilla LP, Laredo, Texas | $5,000,000.00 |
| Tract C | 7.35 acres 14300 Mines Rd, Laredo, Texas | $1,825,000.00 |
| Tract D | Restaurant, 405 AF Muller Blvd., Laredo, Texas | Appraised with Tract E |

| | | |
|---|---|---|
| Tract E | 4.98 acres NW/C Mines Road at Muller Memorial, Laredo, Texas | $2,085,000.00 (collectively with Tract D) |
| Tract F | 17.6 acres S/S Muller Memorial, Laredo, Texas | $1,810,000.00 |
| Tract H | 9.61 acres Muller Memorial at pond, Laredo, Texas | $1,215,000.00 |
| Tract J | 2.60 acres at Starling Creek, Laredo, Texas | $285,000.00 |
| Tract K | 8.6 acres at La Bota Pkwy and Muller Memorial, Laredo, Texas | $620,000.00 |
| Tract L | 61.11 acres (located adjacent and to the south of the developed residential lots a/k/a Starling Creek at La Bota Ranch, Laredo, Texas) | $2,750,000.00 |
| Tract FR | 529.85 acres, Laredo, Texas | $15,375,000.00 |
| Tract SG | 65.9 acres Laredo Rock Tech Pit, Laredo, Texas | $3,800,000.00 |
| 72 Single Family Lots | 72 Single Family Lots located in Starling Creek Subdivision, Laredo, Texas | $1,620,000.00 |
| 12835 E Fwy | A Discount Mini Storage, Harris County, Texas | $1,400,000.00 |
| | Sewer Infrastructure | $975,000.00 |
| | Roadway ROW | $500,000.00 |
| 5448 Riverview | Riverview Acres, Nueces County, Texas | $685,741.29 |
| | **Total Value:** | **$41,190,714.29** |

## ARTICLE VII – CONFIRMATION OF THE JOINT PLAN

### A.   *Solicitation of Acceptances.*

As a condition precedent to confirmation of a plan of reorganization, Section 1125 of the Bankruptcy Code requires that there be post-petition disclosure in the form of a disclosure statement, which provides "adequate information" to creditors whose claims the Debtors have scheduled or who have filed a Proof of Claim against La Bota and/or Rock Tech.  The Disclosure Statement is intended to assist creditors in evaluating the Joint Plan and in determining whether to accept the Joint Plan.  Under the Bankruptcy Code, your acceptance of the Joint Plan may not be solicited unless you receive a copy of this Disclosure Statement prior to or concurrent with such solicitation.

### B.        Persons Entitled to Vote on Joint Plan.

Only the votes of classes of creditors which are impaired under the Joint Plan are counted in connection with confirmation of the Joint Plan.   Generally, and subject to the specific provisions of Section 1124 of the Bankruptcy Code, this includes creditors who, under the Joint Plan, may receive less than full payment of their claims.

In determining acceptance of the Joint Plan, votes will only be counted by creditors whose claims are duly scheduled by the Debtors as undisputed, non-contingent and liquidated, or who, prior to the hearing on confirmation have filed with the Court a Proof of Claim which has not been disallowed or suspended prior to the tabulation of votes on the Joint Plan.  The Ballot form, which you will receive, <u>does not constitute a Proof of Claim</u>.  If you are in any way uncertain of whether your claim has been correctly scheduled, you should check the Debtors' Schedules, which are on file with the Bankruptcy Clerk.  The Clerk of the Bankruptcy Court will not generally provide you with this information by telephone.

### C.        Hearing on Confirmation of Joint Plan.

The Bankruptcy Court will set a hearing to determine whether the Joint Plan has been accepted by the requisite number of creditors and whether the other requirements for confirmation of the Joint Plan have been satisfied.  Each creditor will receive, either with the Disclosure Statement or separately, the Bankruptcy Court's Notice of Hearing on Confirmation of the Joint Plan.

### D.        Acceptance Necessary for Confirmation.

At the scheduled hearing, the Bankruptcy Court must determine, among other things, whether La Bota's plan and Rock Tech's plan have been accepted by each impaired class. Pursuant to Section 1126 of the Bankruptcy Code, an impaired class is determined to have accepted a plan if at least two-thirds in monetary amount and more than one-half in number of the allowed claimants, who are class members and have voted on the plan, have voted for acceptance of the plan.  Further, unless there is unanimous acceptance of the plan by an impaired class, the Court must also determine that, under the plan, class members will receive property of value, as of the effective date of the plan, that is not less than the amount that such class members would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

As a creditor, your vote is important.  La Bota and Rock Tech urge as many creditors as possible fill in and return the Ballot form to the respective Debtor's counsel.

### E.        Confirmation of the Joint Plan without Necessary Acceptance.

In the event that any impaired class of Claims does not accept either La Bota's and/or Rock Tech's plan, the Bankruptcy Court may still confirm either La Bota's and/or Rock Tech's plan at the request of the respective Debtor if, as to each impaired class which has not accepted either La Bota's and/or Rock Tech's plan, such  plan "does not discriminate unfairly" and is "fair

and equitable." A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for its Claims. "Fair and equitable" has different meanings for Secured Claims and Unsecured Claims.

With respect to Secured Claims, "fair and equitable" means either: (i) the impaired Secured Creditor retains its liens to the extent of its Allowed Claim and receives deferred cash payments at least equal to the allowed amount of its Claim with a present value as of the plan's Effective Date at least equal to the value of such Secured Creditor's interest in the property securing its liens; or (ii) property subject to the lien of the impaired Secured Creditor is sold free and clear of that lien, with that lien attaching to the proceeds of the sale, and such lien proceeds must be treated in accordance with clauses (i) and (ii) hereof, or (iii) the impaired Secured Creditor realizes the "indubitable equivalent" of its claim under the plan.

With respect to Unsecured Claims, "fair and equitable" means either (i) each impaired Unsecured Creditor receives or retains property of a value equal to the amount of its Allowed Claim; or (ii) the holders of the Claims that are junior to the Claims of the dissenting class will not receive any property under the plan.

In the event one or more classes of impaired Claims rejects either La Bota's and/or Rock Tech's plan, the Bankruptcy Court will determine at the hearing for confirmation of such plan whether it is fair and equitable and does not discriminate unfairly against any rejecting impaired class of Claims.  If the Bankruptcy Court determines that such plan is fair and equitable and does not discriminate unfairly against any rejecting impaired class of Claims, the Bankruptcy Court can confirm the plan over the objection of any impaired class.  The Debtors intend to request the Court to cramdown their respective plan.

## ARTICLE VIII – ALTERNATIVES TO THE JOINT PLAN AND CONSEQUENCES OF REJECTION

La Bota and Rock Tech believe that the Joint Plan, filed contemporaneously herewith, is the most realistic alternative available to the creditors of the Estates.  La Bota and Rock Tech believe that through the implementation of this Joint Plan that creditors will realize a maximum return on their debt.

Should the proposed Joint Plan not be accepted by the creditors of the Estates, three (3) different consequences are possible:

1.  The Bankruptcy Court could allow additional time to the Debtors, or a creditor, to formulate a different plan under Chapter 11;

2.  The proceedings could be converted to a Chapter 7 liquidation proceeding; or

3.  The Bankruptcy Court could dismiss this proceeding.

The most remote possibility is dismissal.  If dismissal were to occur, the Debtors would

no longer have the protection of the Bankruptcy Court and relevant statutes.  As a result of dismissal, each creditor would be free to seek judgments against the Debtors, and in turn, execute against substantially all of La Bota's property and Rock Tech's non-exempt property in satisfaction of its judgment.  This would likely result in a race to the Courthouse which would leave most creditors without any payment whatsoever on their claims.

As to the first and second alternatives, the Debtors are unable to predict whether they would be given additional time to formulate a different Joint Plan.  More probable, the Court would continue the Chapter 11 for a short period of time, during which any party in interest would be allowed to propose a plan.

The Debtors have no present proposition for any alternative plan; however, it is possible that an alternative plan could be formulated at a later date.  This Disclosure Statement will only discuss in detail the effect of a conversion of the case from a Chapter 11 proceeding to a liquidation proceeding under Chapter 7.

A straight bankruptcy proceeding, known as a Chapter 7 proceeding, is a liquidation of a debtor by an impartial trustee.  In a Chapter 7 bankruptcy, the amount to be received by the unsecured creditors depends on the net proceeds available after all assets of the debtor have been reduced to cash and secured creditors and administrative priorities have been paid in full.  The conversion of this case to Chapter 7 would probably result in the Secured Creditors foreclosing on La Bota's collateral.  Should this case be converted to a Chapter 7, the present priority structure would change to the extent that the Chapter 11 administrative priority claims would have a priority lower than those priority claims generated by the Chapter 7 case, such as the trustee's fees.  Conversion to Chapter 7 would create an additional layer of priority claims.

## ARTICLE IX – SUMMARY OF THE JOINT PLAN

Any capitalized terms not defined in this Disclosure Statement shall have the meaning ascribed to such defined terms in the Joint Plan, the Bankruptcy Code and/or Bankruptcy Rules.

The Joint Plan proffered by La Bota and Rock Tech proposes to satisfy i) all allowed secured claims to the extent of the value of their collateral; ii) all administrative claims will be paid under the terms of the Joint Plan from the Distributable Proceeds; and iii) all allowed unsecured claims of both La Bota and Rock Tech will be paid in full.

Satisfaction of La Bota's Creditor's claims will be derived from the transfer of certain real property and post-confirmation operating revenue.  Payment of Rock Tech's Creditor's claims will be derived from post-confirmation operating revenue and other monies that may be available to satisfy the indebtedness.  For the purpose of the Joint Plan, La Bota's gross operating proceeds after the deduction of monthly operating and other expenses, shall be referred to as the Distributable Proceeds of La Bota.  Rock Tech's post-confirmation income shall be referred to as the Distributable Proceeds of Rock Tech.

All expenses of administration shall be paid out of the respective Debtor's Distributable Proceeds.  Note that certain expenses are subject to Court approval.  The Court will retain

jurisdiction over the estate until substantial consummation has occurred.   All of La Bota's obligations for taxes will be satisfied under Section 1129(a)(9)(c) from the Distributable Proceeds of La Bota.

The claims are to be classified as follows:

Class 1 – La Bota's Administrative Claims.   Class 1 shall consist of the Allowed Administrative Claims of any person or entity entitled to priority under § 507(a)(2) against La Bota.  The class shall include (i) the claims of professionals retained by La Bota with respect to professional services rendered during the Chapter 11 case, and (ii) claims incurred by La Bota after the Petition Date in, or arising from, the ordinary course of business of the Debtor ("*La Bota Administrative Claims*").  La Bota Administrative Claims are to be paid in Cash, in full, up to the amount of the Allowed Claim, on the Effective Date, after the Claim becomes an Allowed Claim, but in no event sooner than the time that the Confirmation Order becomes a Final Order or fourteen (14) days after the date of a Final Order determining the amount of each Claim for Administrative Expense, whichever is later, or on such terms as may be agreed between La Bota and holders of such claims.  Class 1 is not impaired.

Class 2 – Rock Tech's Administrative Claims.   Class 2 shall consist of the Allowed Administrative Claims of any person or entity entitled to priority under § 507(a)(2) against Rock Tech.  The class shall include (i) the claims of professionals retained by Rock Tech with respect to professional services rendered during the Chapter 11 case, and (ii) claims incurred by Rock Tech after the Petition Date in, or arising from, the ordinary course of business of the Debtor ("*Rock Tech Administrative Claims*").  Rock Tech Administrative Claims are to be paid in Cash, in full, up to the amount of the Allowed Claim, on the Effective Date, after the Claim becomes an Allowed Claim, but in no event sooner than the time that the Confirmation Order becomes a Final Order or fourteen (14) days after the date of a Final Order determining the amount of each Claim for Administrative Expense, whichever is later, or on such terms as may be agreed between Rock Tech and holders of such claims.  Class 2 is not impaired.

Class 3 – La Bota's Priority Tax Claims.   Class 3 shall consist of the Allowed Tax Claims against La Bota of any person or entity entitled thereto under § 507(a)(8) of the Code.  Allowed Claims of taxing authorities will be paid with deferred Cash payments, bearing interest at twelve percent (12%) annual interest, over a period not exceeding fifty-five (55) months after the date of assessment of such claim, of a value, as of the Effective Date, equal to the allowed amount of such claim as permitted by Bankruptcy Code § 1129(a)(9)(c), to commence thirty days after the Effective Date.  Presently $72,078.55 in tax claims have been filed against La Bota; however, it appears that this figure includes both 2009 and 2010 taxes.  On its Schedules, La Bota listed its priority tax liability as $28,706.81 for 2009.  Class 3 is impaired.

Class 4 – Secured Claim of Bank Midwest, N.A. against La Bota.   Class 4 shall consist of the Allowed Secured Claim of Bank Midwest, N.A. ("*BMW*") on the Land Loans, but only to the extent the claim has been allowed pursuant to § 502 of the Bankruptcy Code and to the extent of the value of the security as determined in accordance with § 506 of the Bankruptcy Code.  The Land Loans are described in the Schedules filed by La Bota which reflect an amount owing of $10,886,303.00.  Pursuant to its Schedules, La Bota is indebted to BMW for approximately

$10,886,303.00 on the Land Loans. BMW filed three proof of claims with respect to the Land Loans claiming La Bota's indebtedness is $11,083,750.62. La Bota believes that BMW is oversecured based upon the appraised value of the Debtor's assets. The BMW Commercial Guaranty is described in the Schedules filed by La Bota in the amount of $502,492.57. Any indebtedness arising from the Commercial Guaranty is addressed in Class 5 below.

La Bota will pay BMW by and through the transfer of certain real property in exchange for the full satisfaction of all outstanding indebtedness owed by La Bota to BMW. Upon the transfer of the real properties listed below to BMW, La Bota's total outstanding indebtedness to BMW shall be extinguished and BMW shall have no claims against La Bota. All indebtedness owed by La Bota to BMW shall be fully and finally satisfied. BMW shall have no right or ability to pursue claims related to or arising from the satisfied indebtedness against La Bota. Further, given the full and complete satisfaction of the indebtedness through the conveyance of the below listed real property, BMW shall be barred from pursuing any claims related to or arising from the La Bota satisfied indebtedness, including but not limited to personal guaranties. The following tracts of real property shall be conveyed to BMW in full satisfaction of all outstanding indebtedness owed by La Bota to BMW:

1. Tract A, described as a 3.01 acre tract consisting of a commercial "hard corner" located in Laredo, Webb County, Texas, at the southwest corner of the intersection of Mines Road, a/k/a FM 1472 and International Trade Center Blvd. ("*Tract A*"). The tract has an appraised value of $1,245,000.00. This tract is currently unencumbered. The Tract is depicted and is labeled "A" on the attached Exhibit "7".

2. Tract E, described as a 4.98 acre tract consisting of a commercial "hard corner" located in Laredo, Webb County, Texas, at the northwest corner of the intersection of Mines Road, a/k/a FM 1472 and A. F. Muller Sr. Mem. Blvd. ("*Tract E*").

3. Tract D, described as a 1.0 acre tract of land together with a building formerly occupied by a restaurant and containing 3954 square feet of rentable space ("*Tract D*"). The property is fully platted with City of Laredo water and sewer servicing the property. This is a commercial tract located in Laredo, Webb County, Texas, at the address of 400 A. F. Muller Sr. Mem. Blvd.

   Tract D and E, although platted independently are combined herein to allow for a higher value contiguous tract. The greater depth, width and continuity resulting from the combination of the two tracts, allows for greater flexibility and marketability. These tracts were appraised together as one tract. The Tract D and Tract E, collectively, have an appraised value of $2,085,000.00. These tract are currently unencumbered. The Tracts are depicted and labeled "D E" on the attached Exhibit "7".

4.     Tract F, described as a 17.6 acre tract consisting of a commercial "hard corner" located in Laredo, Webb County, Texas, at the southwest corner of the intersection of Mines Road, a/k/a FM 1472 and A. F. Muller Sr. Mem. Blvd. ("***Tract F***").    The tract has an appraised value of $1,810,000.00.    This tract is currently unencumbered.  The Tract is depicted and is labeled "F" on the attached Exhibit "7".

5.     Tract H, described as a 9.6 acre tract consisting of a platted high density residential tract, planned to be developed as zero lot line town homes the tract is located adjacent to a 4 acre pond/lake with a 6' wide asphalt jogging trail circling the pond/lake ("***Tract H***").  The tract is bounded by A. F. Muller Sr. Mem. Blvd. to the south with access to A. F. Muller Sr. Muller Blvd. for ingress and egress to the tract.  The tract has an appraised value of $1,215,000.00. This tract is currently unencumbered. The Tract is depicted and is labeled "H" on the attached Exhibit "7".

6.     79 acres of land depicted as "79 acre Tract" on the attached Exhibit "7" ("***79 Acre Tract***").   The 79 Acre Tract is out of the 529.85 future development acre tract.   The 529.85 future development tract has an appraised value of $15,375.000.00 or $29,000.00 per acre.  The 79 Acre Tract therefore has an appraised value of $29,000.00 per acre or $2,291,000.00.   This tract is currently encumbered by a first lien held by BMW. The 79 Acre Tract is depicted and is labeled "79 acre Tract" on the attached Exhibit "7".

7.     86 acres of land depicted with the 57.61 Acre Tract (defined below) as a portion of the "143.61 acre Tract" on the attached Exhibit "8" ("***86 Acre Tract***").  This 86 Acre Tract is out of the 529.85 future development acre tract.   The 529.85 future development tract has an appraised value of $15,375,000.00 or $29,000.00 per acre.  This 86 Acre Tract therefore has an appraised value of $29,000.00 per acre or $2,494,000.00. This tract is currently encumbered by a first lien held by BMW.

8.     57.61 acres of land depicted with the 86 Acre Tract as a portion of the "143.61 acre Tract" on the attached Exhibit "8" ("***57 Acre Tract***").  This 57 Acre Tract will provide BMW with a 15% equity cushion. The 529.85 future development tract has an appraised value of $15,375,000.00 or $29,000.00 per acre.  This 57 Acre Tract therefore has an appraised value of $29,000.00 per acre or $1,670,690.00.    This tract is currently encumbered by a first lien held by BMW.

In exchange for the conveyance of the above-described real property, all indebtedness owed by La Bota to BMW shall be extinguished.  Further, unless specifically allowed or granted in the Joint Plan, any and all liens held by BMW over La Bota's real or personal property shall be released.  The total value of the real property to be transferred to BMW in full and complete satisfaction of the La Bota's indebtedness to BMW is $12,810,690.00.  Class 4 is impaired.

Class 5 – Secured Claim of Bank Midwest, N.A. against Rock Tech.  Class 5 shall consist of the Allowed Secured Claim of BMW on the Equipment Loans and on the Working Capital Loan, but only to the extent the claim has been allowed pursuant to § 502 of the Bankruptcy Code and to the extent of the value of the security as determined in accordance with § 506 of the Bankruptcy Code.  The Equipment Loans and Working Capital Loan are more fully described in the Schedules filed by Rock Tech which reflect a total amount owing of $1,406,464.17, more specifically, they list the amount owed under the Working Capital Loan as $502,492.57, and the amount owed under the Equipment Loans as $903,971.60 .  BMW filed two proof of claims with respect to the Equipment Loans and on the Working Capital Loan claiming Rock Tech's total indebtedness is $1,462,217.14.  The amount of the Allowed Secured Claim shall be converted into a single note with the same principal balance (the "***BMW Note***").

The BMW Note will be paid with deferred cash payments, amortized over a ten (10) year period, bearing interest at five percent (5%) annual interest, with a balloon payment at the end of five (5) years.  The amount of the balloon payment on the BMW Note will be approximately $799,000.00.

BMW's liens on all of the Rock Tech Equipment shall be retained.  To further secure the BMW Note, BMW shall retain a first lien on Tract SG, described as a 65.9 acre of land located within La Bota Ranch which is the location of the Laredo Rock Tech Sand & Gravel, LP Pit.  Tract SG has an appraised value of $3,800,000.00.  The Laredo Rock Tech Sand & Gravel Pit Tract is labeled on the attached Exhibit "7".  To further secure the BMW Note, BMW shall retain a first lien on a 35 acre tract (the "35 Acre Tract").  The 35 Acre Tract is out of the 529.86 Acre Tract.  The 529.86 Acre Tract has an appraised value of $15,375,000.00 or $29,000.00 per acre.  Thus, the 35 Acre Tract has an appraised value of $29,000.00 per acre or $1,015,000.00.  The 35 Acre Tract is labeled on the attached Exhibit "7".

The Commercial Guaranty between BMW and La Bota associated with the Working Capital Loan shall be extinguished when Rock Tech's indebtedness is converted to the BMW Note.  The extent of La Bota's banking relationship with BMW under the BMW Note consists solely of BMW's retained first liens on Tract SG and the 35 Acre Tract which are owned by La Bota.  Class 5 is impaired.

Class 6 – Secured Claim of First National Bank against La Bota.  Class 6 shall consist of the Allowed Secured Claim of FNB on the 1.7M Note, but only to the extent the claim has been allowed pursuant to § 502 of the Bankruptcy Code and to the extent of the value of the security as determined in accordance with § 506 of the Bankruptcy Code.  The 1.7M Note is more fully described in the Schedules filed by La Bota which reflect an amount owing of $1,555,443.84.  The Allowed Secured Claim shall be converted into a single note with the same principal balance (the "***FNB Note***").

The FNB Note shall be interest only payable in monthly installments with a two (2) year balloon payment.  The annual interest rate shall be 7.4%.  The projected monthly interest payments at the beginning of the FNB Note shall be approximately $10,000.00.  As individual lots from the 72 Single Family Lots are sold, FNB shall receive $18,000.00 from the sale of each

lot.  Based on historical date, La Bota estimates that it will be able to sell approximately one lot per month.  Thus, on the date the balloon payment is scheduled to mature the outstanding number of lots remaining from the 72 Single Family Lots is projected to be 46.  The interest payments shall be reduced as the lots are sold and the principal is reduced.  The projected two (2) year balloon payment will be approximately $645,000.00.  The $645,000.00 figure anticipates the sale of Tract "L" to the United Independent School District.  FNB currently asserts a first lien on Tract L, the 61.11 acre tract.  La Bota believes that the sale will occur prior to the date the balloon payment comes due.  FNB shall reduce its release price that is attached to Tract L from the "full amount of the outstanding indebtedness" to $800,000.00.  It is projected that FNB will receive a principal payment of $800,000.00 in exchange for the release of its first lien on Tract L.

Additionally, FNB shall loan additional funds to cover the amount of the ad valorem taxes attributable to the 72 Single Family Lots and that accrue each year for the term of the loan on the collateral.

To secure the FNB Note, FNB shall retain its first lien on Tract L. Tract L has an appraised value of $2,750,000.00.   Tract L is so labeled on the attached Exhibit "7".  To further secure the FNB Note, FNB shall also retain its first lien on the 72 Single Family Lots located within Starling Creek.  This first lien position will continue in full force and effect.  As discussed above, FNB shall continue to receive all net proceeds from the sales of the lots mentioned herein.  The 72 Single Family Lots have an appraised value of $22,500.00 per lot.  The valuation is based on a bulk sales transaction discount.  Each of the 72 Single Family Lots retails for $35,000.00 apiece.  The total bulk sales discount appraised valuation is $1,620,000.00.  Class 6 is impaired.

Class 7 – Secured Claim of A Discount Mini Storage II, Ltd. against La Bota.  Class 7 shall consist of the Allowed Secured Claim of DMS on the 120k Note, but only to the extent the claim has been allowed pursuant to § 502 of the Bankruptcy Code and to the extent of the value of the security as determined in accordance with § 506 of the Bankruptcy Code.  The 120k Note is more fully described in the Schedules filed by La Bota which reflects an amount owing of $118,000.00.  The Allowed Secured Claim shall be converted into a single note with the same principal balance (the "*DMS Note*").

The DMS Note shall be amortized over a thirty (30) year period with an annual interest rate of four and one-half percent (4.5%) with a seven (7) year balloon.  The DMS Note will be paid with deferred case payments.  La Bota shall make monthly principal and interest payments in the amount of approximately $600.00 until the debt is entirely extinguished or until the DMS Note matures.  The amount of the balloon payment on the DMS Note at maturity shall be approximately $102,829.63.

To secure the DMS Note, DMS shall retain a first lien on the Mini Storage facility located at 12835 East Fwy, Houston, TX, 77015.  12835 East Fwy, Houston, TX, 77015 consists of approximately 1.28 acres of land together with improvements.   The improvements are generally described as approximately 37,000.00 square feet of net rentable self storage space.  The Harris County tax ad valorem appraised value is $1,246,000.00.   The retail fair market valuation is $1,400,000.00.  Class 7 is impaired.

Class 8 – Secured Claim of Integrated Vehicle Leasing against La Bota.  Class 8 shall consist of the Allowed Secured Claim of IVL.  La Bota shall reaffirm the outstanding Lease which shall be paid by Rock Tech.  The original term of the Lease was for fifty-nine (59) months.  La Bota ceased making payments on payment number 53.  The agreement will resume with monthly payment number 53.  The remaining payments end in February 2011.  The total outstanding amount owed to IVL on the Lease is $8,085.12.  The monthly payment amounts are $1,347.52, until February 2011 when the agreement will be 100% fulfilled.  Class 8 is not impaired.

Class 9 – La Bota's Allowed Claims of General Unsecured Creditors.  Class 9 shall consist of any Allowed Claim against La Bota that is not a Class 1 La Bota Administrative Claim, a Class 3 Priority Tax Claim against La Bota, a Class 4 Secured Claim of Bank Midwest, N.A. against La Bota, a Class 6 Secured Claim of First National Bank against La Bota, a Class 7 Secured Claim of A Discount Mini Storage II, Ltd. Against La Bota or a Class 8 Secured Claim of Integrated Vehicle Leasing against La Bota ("*La Bota General Unsecured Claims*").  Holders of a Class 9 Allowed La Bota General Unsecured Claims shall be paid in full by monthly payments over the course of sixty (60) months.  The interest rate shall be zero.  It is anticipated that the total payment to the Allowed La Bota General Unsecured Claims will be approximately $1,000.00 per month.  The total value of the general unsecured claims La Bota listed in its Schedules is $60,155.56.  However, La Bota disputes the validity of approximately 70% of the value of those claims.  The total value of general unsecured proof of claims asserted against La Bota is $36,413.15.  Class 9 is impaired.

Class 10 – Rock Tech's Allowed Claims of General Unsecured Creditors.  Class 10 shall consist of any Allowed Claim against Rock Tech that are not a Class 2 Rock Tech Administrative Claim, or a Class 5 Secured Claim of Bank Midwest, N.A. against Rock Tech ("*Rock Tech General Unsecured Claims*").  Holders of a Class 10 Allowed Rock Tech General Unsecured Claims shall be paid monthly payments over the course of sixty (60) months.  The interest rate shall be zero.  It is anticipated that the total payment to the Allowed Rock Tech General Unsecured Claims will be approximately $1,500.00 per month if all such claims were allowed.  The total value of the general unsecured claims Rock Tech listed in its Schedules is $92,877.82.  However, Rock Tech disputes the validity of approximately 90% of the value of those claims.  The true total value of general unsecured claims against Rock Tech is $100.00.  Class 10 is impaired.

Class 11 – La Bota's Equity Interests.  The current shareholders will retain their equity in La Bota, but will not take dividends until all Class 1, 3, 4, 6, 7, 8 and 9 claims are paid in full.  Class 11 is impaired.

Class 12 – Rock Tech's Equity Interests.  The current shareholders will retain their equity in Rock Tech, but will not take dividends until all Class 2, 5 and 10 claims are paid in full.  Class 12 is impaired.

## ARTICLE X – ADMINISTRATIVE EXPENSES

All of La Bota's and Rock Tech's post-petition administrative expenses and operating expenses have been satisfied on a regular basis out of each respective Debtor's income. While the Joint Plan contemplates payment of Administrative Claims owed to professionals on the Effective Date of the Joint Plan, this is only for outstanding unpaid Professional Fees in excess of the retainers held by such professionals, and the amounts paid to such professionals prior to plan confirmation. Administrative expenses are as follows:

1. <u>Hughes Watters Askanase, L.L.P. (Legal Fees) (counsel for La Bota and Rock Tech)</u>. No final fee estimate can yet be made. Fees incurred to date (May 3, 2010 – August 31, 2010) shall be supplemented at a later date.

2. <u>Carranco & Lawson, P.C. (Accounting Fees) (accountant for La Bota and Rock Tech)</u> No final fee estimate can yet be made. Fees incurred to date (May 3, 2010 – August 31, 2010) are approximately $8,032.00 for La Bota and $1,844.00 for Rock Tech.

3. <u>Trustee's Fees</u>. The U.S. Trustee's office charges quarterly fees for all Chapter 11 proceedings. The current quarterly fees owed to the U.S. Trustee is approximately $1,900.00

## ARTICLE XI – EXECUTORY CONTRACTS

The executory contracts and unexpired leases expressly assumed by La Bota are listed in Exhibit "8" attached hereto. The executory contracts and unexpired leases expressly assumed by Rock Tech are listed in Exhibit "9" attached hereto. All executory contracts and unexpired leases not already assumed or expressly assumed in the Joint Plan shall be deemed rejected by La Bota and/or Rock Tech under the Joint Plan on the Effective Date.

## ARTICLE XII – IMPLEMENTATION AND EXECUTION OF JOINT PLAN

### A.    *Assets of the Reorganized Debtors.*

Pursuant to the provisions of Sections 1141(b) and 1141(c) of the Bankruptcy Code, all assets of La Bota will vest in La Bota on the Effective Date, and all assets of Rock Tech will vest in Rock Tech on the Effective Date.

### B.    *Business Operations of La Bota and Rock Tech.*

Upon the Effective Date of the Joint Plan, La Bota and Rock Tech shall be free to conduct their respective Confirmation Businesses. Also upon the Effective Date of this Joint Plan the Debtors shall be free to manage their respective affairs, and to enter into transactions without restriction or limitation imposed under any provision of the Bankruptcy Code.

With respect to the management of La Bota, the management and their respective compensation of the reorganized La Bota will be as follows:

| President & Secretary | Albert F. Muller, III | $6,230.00 per month |
|---|---|---|
| Chief Financial Officer | Greg J. Ebe | $3,790.00 per month |
| Vice President & Director of Marketing/Sales/Property Owners Association | Virginia C. Muller | $3,325.00 per month |
| Vice President & Director of Operations including Governmental Liaison (for Taxes and Wildlife Management) | Albert F. Muller, Jr. | $3,000.00 per month |

With respect to the management of Rock Tech, the management and their respective compensation of the reorganized Rock Tech will be as follows:

| Managing Member of General Partner | Albert F. Muller, III | $0.00 per month |
|---|---|---|
| Chief Financial Officer | Greg J. Ebe | $3,000.00 per month |
| Director of Operations | Albert F. Muller, Jr. | $3,000.00 per month |

### C. Distributions.

1. <u>Distribution of Distributable Proceeds.</u> Except as otherwise provided in the Joint Plan, on the Distribution Dates, La Bota shall begin distributing the Distributable Proceeds of La Bota to the holders of Class 1, 3, 4, 6, 7, 8 and 9 Claims pursuant to their respective payment schedule, and Rock Tech shall begin distributing the Distributable Proceeds of Rock Tech to holders of Class 2, 5 and 10 Claims.

### D. Objection to Allowance of Claims / Interests.

Only the Debtors may prosecute objections to the allowance of any Claim or interest not specifically allowed under such Debtor's respective plan. Upon Confirmation of each Debtor's plan, all Claims and interests set forth within the Schedules of Assets and Liabilities, as liquidated, non-contingent and/or non-disputed, are deemed "Allowed Claims" unless the respective Debtor, within one-hundred and twenty (120) days thereafter, has filed an objection thereto. The Debtors may file objections to any and all Claims or interests, whether or not scheduled as disputed, unliquidated or contingent on the Claims schedule, at any time prior to the expiration of one-hundred and twenty (120) days after the Effective Date. If, within the time so specified, no objection is filed to the allowance of any Claim or interest duly scheduled or otherwise proved, such Claim or interest shall be deemed allowed in the amount which is proved and the holder of such Claim or interest shall be entitled to obtain distribution thereon. The expense of prosecuting Claims or interest objections shall be borne by the Estate, except as otherwise awarded by the Court. The Debtors shall have the right to enter into any settlement with respect to any Claim for an amount less than $20,000.00 without further approval by the Court. At this time the Debtors are currently performing their respective claims analysis, and

expressly reserve the right to object to all claims, and to amend the schedules prior to confirmation.

### E.    Preservation of Debtor's Causes of Action.

All claims for return of preference payments or for fraudulent transfers pursuant to § 544, § 547, § 548, § 549 and/or § 550 of the Code, all claims existing against officers and directors of both La Bota and Rock Tech, all claims against third parties on account of an indebtedness, and other claims of the Debtors, to the extent not specifically compromised and released pursuant to the Joint Plan, are hereby preserved and retained for enforcement by the respective Debtor subsequent to the Effective Date.  The payments made during the preference period are detailed on each respective Debtor's Statement of Financial Affairs in response to Question 3.  Attached hereto as Exhibits "3" and "6" is a true and correct copy of the Debtors' responses to Question 3.  No claim of the Debtors shall be waived, compromised, settled, relieved or relinquished solely as a result of plan confirmation.

All claims held by each respective Estate shall be prosecuted by the respective Debtor or the respective Reorganized Debtor.  All decisions with respect to the prosecution and/or settlement of such claims shall be made by the respective Reorganized Debtor.  All costs associated with prosecuting such claims shall be paid by the respective Reorganized Debtor.

### G.    Non-Consensual Confirmation.

With respect to any class of Claims that does not vote to accept this Joint Plan, the Debtors will seek to confirmation of each of their plans through application of the "cramdown" provisions of Section 1129(b) of the Code.

### H.    Conditional Effective Date.

The Effective Date is conditioned upon the Confirmation Order becoming final and non-appealable.

## ARTICLE XIII – DISCHARGE OF DEBTORS, INJUNCTION AND RELEASES

### A.    Discharge.

Except as otherwise provided in the Joint Plan or in the Confirmation Order, Confirmation shall operate as a discharge pursuant to Section 1141(d)(1) of the Code.  The discharge is effective as of the Effective Date, of any and all debts or Claims against either Debtor that arose anytime before Confirmation, including but not limited to all debts or Claims that accrued before, on or after the Petition Date.  As to every discharged debt and Claim, the Creditor that held such debt or Claim shall be precluded from asserting against either Debtor, or such Debtor's respective Estate, any further Claim based upon any document, instrument or act, omission, transaction or any other activity of any kind or nature that occurred prior to the Confirmation Date, including without limitation, Claims in the nature of successor liability.  Without limiting the generality of the foregoing, on the Effective Date the Debtors shall be

discharged from any debt that arose before Confirmation and any debt of the kind specified in Sections 502(g), 502(h), 502(i) of the Code to the full extent permitted by Section 1141(d)(1)(A) of the Code.

**B.      Injunction.**

The Confirmation Order shall operate as a temporary injunction against the commencement or continuation of any act relating to the collection or enforcement of any Claim or rights governed by the discharge provisions hereof ("Discharged Claim") against La Bota absent a default in respect to the treatment of the Claims of the Creditor under La Bota's plan. A default under La Bota's Plan shall not cause a default under Rock Tech's plan. The Confirmation Order shall provide, among other things that except as otherwise provided in this Joint Plan, all Creditors who have held, hold or may hold Claims against La Bota are enjoined from and after the Effective Date unless there has been a default under La Bota's plan, from: (i) commencing or continuing in any manner any action or proceeding of any kind with respect to such Discharged Claim against La Bota; (ii) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree of order against La Bota, the estate with respect to such Discharged Claim; (iii) creating, perfecting or enforcing any encumbrance of any kind against La Bota, or its estate, with respect to any such Claim or interest; and (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due La Bota, its estate, and/or the Reorganized La Bota with respect to any such Discharged Claim.

The Confirmation Order shall operate as a temporary injunction against the commencement or continuation of any act relating to the collection or enforcement of any Claims or rights governed by the discharge provisions hereof ("Discharged Claim") against Rock Tech absent a default in respect to the treatment of the Claims of the Creditor under Rock Tech's plan. A default under Rock Tech's Plan shall not cause a default under La Bota's plan. The Confirmation Order shall provide, among other things that except as otherwise provided in this Joint Plan, all Creditors who have held, hold or may hold Claims against Rock Tech are enjoined from and after the Effective Date unless there has been a default under Rock Tech's plan, from: (i) commencing or continuing in any manner any action or proceeding of any kind with respect to such Discharged Claim against Rock Tech; (ii) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree of order against Rock Tech, his estate with respect to such Discharged Claim; (iii) creating, perfecting or enforcing any encumbrance of any kind against Rock Tech, or his estate, with respect to any such Claim or interest; and (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due Rock Tech, its estate, and/or the Reorganized Debtor with respect to any such Discharged Claim.

**C.      Releases.**

The Debtors, and any officers, partners, directors, employees, any other agents, contractors, employees, financial advisors, attorneys and accountants or any property of the foregoing persons/entities or any direct or indirect transferee of any property, or direct or indirect successor in interest to any of the foregoing persons, or any property of any such transferee or successor shall have no liability to any Creditors with a Claim or interest for any act or omission in connection with or arising out of the administration of this Joint Plan or the property to be

distributed under this Joint Plan, except for willful misconduct or gross negligence.

### D. Protection of Certain Parties in Interest.

If the respective current officers, directors, shareholders, members, representatives, attorneys, financial advisors, and agents of the Debtors, act in good faith, the Joint Plan provides they will not be liable to any holder of a Claim or Equity Interest, or other party with respect to any action, forbearance from action, decision, or exercise of discretion taken from the Petition Date to the Effective Date in connection with (i) the operation of the Debtors; (ii) the proposal or implementation of any of the transactions provided for, or contemplated in, the Joint Plan and the documents and exhibits that aid in effectuating the Joint Plan, ("***Plan Documents***"); or (iii) the administration of the Joint Plan or the assets and property to be distributed pursuant to the Plan Documents; other than for willful misconduct or gross negligence.  The Debtors, the Reorganized Debtors, and their respective affiliates, officers, directors, shareholders, members, representatives, attorneys, financial advisors, and agents may rely upon the opinions of counsel, certified public accountants, and other experts or professionals employed by the Debtors, and the Reorganized Debtors, and such reliance will conclusively establish good faith.  In any action, suit or proceeding by any holder of a Claim or Equity Interest or other party in interest contesting any action by, or non-action of, the Debtors, the Reorganized Debtors or their respective affiliates, officers, directors, shareholders, members, representatives, attorneys, financial advisors, and agents as not being in good faith, the reasonable attorney's fees and costs of the prevailing party will be paid by the losing party and as a condition to going forward with such action, suit, or proceeding at the outset thereof, all parties thereto will be required to provide appropriate proof and assurances of their capacity to make such payments or reasonable attorney's fees and costs in the event they fail to prevail.

### E. Effectuating Documents and Necessary Authorizations.

The Plan Documents, which consist of all documents and exhibits that aid in effectuating the Joint Plan, will be executed and, if appropriate, filed with the appropriate governmental authorities on or before the Effective Date, and they will become effective on the Effective Date.

The Debtors will have authority to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of each Debtor's plan.

The Debtors, if and to the extent necessary, will seek such orders, judgments, injunctions, regulatory approvals, and rulings that may be required to carry out and further the intentions and purposes, and give full effect to the provisions, of each Debtor's plan.

### F. Regulatory Approvals.

As the Joint Plan is not intended to modify or supplement any regulatory authority over the Debtors, all regulatory approvals required to be obtained in connection with the plan will be sought and obtained.

**G.**      ***Objection Procedures and Treatment of Disputed Claims and Bar Dates.***

**1**.      **Objection Deadline and Process.**

Under the Joint Plan, the Debtors shall have the exclusive authority to object to the allowance of any Claim, which shall be exercised at the sole discretion of the Debtors.  All objections to Claims must be filed within one hundred twenty (120) days following the Effective Date of the Joint Plan, unless extended by the Bankruptcy Court.

Notice of any proceedings with respect to a Claim Objection, including a settlement or withdrawal, will be sufficient if served by La Bota and/or Rock Tech on the holder of the Claim to which Objection has been made.  Rule 9019 of the Bankruptcy Rules will not apply to the settlement or withdrawal of any Claim Objection.

Each Claim known to La Bota  at the Petition Date is listed on Exhibit "1"; each Claim know to Rock Tech at the Petition Date is listed on Exhibit "4".  Creditors who believe that they hold Claims against the Estate, but whose Claims do not appear on Exhibit "1" and/or Exhibit "4", or who believed the respective Debtor owed them an amount greater than that listed on either Exhibit "1"or Exhibit "4", were required by the Bankruptcy Court to file a proof of claim prior to the Claims Bar Dates.

While there are a number of Claims against the Debtors, there is a small number of actual or possible Claim Objections to Proof of Claims filed against the Debtors' Estate.  Most of the Claim Objections are of a routine nature.

However, the Debtors expect that some Claim Objections will be more substantive and may require litigation in order to resolve the allowance of the Claim.  **DO NOT VOTE BASED ON THE ASSUMPTION THAT YOUR CLAIM WILL BE ALLOWED.  CLAIM OBJECTIONS MUST BE RESOLVED AND YOU SHOULD NOT BELIEVE THAT YOUR CLAIM WILL BE ALLOWED MERELY BECAUSE YOU FILED A PROOF OF CLAIM OR CAST A VOTE FOR OR AGAINST THE JOINT PLAN.**

**2.**      **Bar Date to File an Administrative Claim or a Claim for Rejection Damages.**

The bar date to file an Administrative Expense claim against either of the Debtors is thirty days after the Effective Date.  The bar date to file a claim for any damages resulting from a rejection of an executory contract that is rejected through the Joint Plan, is thirty days after the Effective Date.

No payments will be made to the holder of a Claim until all Objections to that Claim have been resolved by Final Order.

H.    **Provisions Governing Distributions.**

1.    **Distribution Responsibility.**

La Bota will be responsible for all distributions under the terms of its plan.  Rock Tech will be responsible for all distributions under the terms of its plan.

2.    **Delivery of Distributions.**

Subject to Rule 9010 of the Federal Rules of Bankruptcy Procedure, distributions to holders of Allowed Claims will be made at the address of each such holder as set forth on the proofs of claim filed by such holders, or at the last known address of such holder if no proof of claim is filed or if  the respective Debtor has been notified in writing of a change of address.

3.    **Distributions to Holders of Disputed Claims.**

At such time as a Disputed Claim becomes an Allowed Claim, the respective Debtor shall pay that claim within thirty (30) days of such determination.  However, if the class to which the former Disputed Claim belongs to has not received a distribution, or has only received a partial distribution under the Joint Plan, such claim will be paid at the same time the class receives its future distributions, and such claim will receive any previously made distributions within thirty (30) days of the date that the Disputed Claim becomes an Allowed Claim.

I.    **Confirmation of the Joint Plan.**

1.    **Confirmation Hearing.**

Section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the plan, ("Confirmation Hearing").  Pursuant to the Order Under 11 U.S.C. § 1125 and Bankruptcy Rule 3017 Approving Disclosure Statement and Fixing Time for Filing Acceptances and Rejections to the Chapter 11 Joint Plan of Reorganization entered by the Bankruptcy Court on _____ ___, 2010, the Confirmation Hearing has been scheduled before the **Honorable United States Bankruptcy Judge Richard S. Schmidt, United States Bankruptcy Court, 1133 N. Shoreline Blvd., Corpus Christi, Texas 78401 on _____ at _____ Central Standard Time.**  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except an announcement made at the Confirmation Hearing or any adjournment thereof.

Section 1128(b) provides that any party-in-interest may object to confirmation of the Joint Plan.  However, an impaired Creditor, who votes to accept the Joint Plan, may not have standing to object to the Joint Plan.  Objections to confirmation of the plan are governed by Bankruptcy Rule 9014 and any applicable Local Rules of the Bankruptcy Court.  Any objection to confirmation must be made in writing and filed with the Bankruptcy Court with proof of service and served upon and actually received on or before _____.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**2.      Statutory Requirements for Confirmation of the Joint Plan.**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Bankruptcy Code's requirements for confirmation of each Debtor's plan has been satisfied, in which event the Bankruptcy Court will enter an order confirming the Joint Plan. As set forth in 11 U.S.C. § 1129 of the Bankruptcy Code, these requirements are as follows:

(a)     The plan complies with the applicable provisions of the Bankruptcy Code.

(b)     The proponents of the plan comply with the applicable provisions of the Bankruptcy Code

(c)     The plan has been proposed in good faith and not by any means forbidden by law.

(d)     Any payments made or to be made by the plan proponents, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in, or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Court as reasonable.

(e)     (a)(i)   The proponents of the plan have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, or officer of the Debtors, any affiliate of the Debtors participating in a Joint Plan with the Debtors, or a successor to the Debtors under the plan; and

(ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

(iii) the proponents of the plan have disclosed the identity of any insider that will be employed or retained by the reorganized Debtor, and the nature of any compensation for such insider.

(f)     Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the Plan Proponents has approved any rate change provided for in the Joint Plan, or such rate change is expressly conditioned on such approval.

(g)     With respect to each class of impaired claims or equity interests:

        (i)      each holder of a claim or interest of such class:

              (1)      has accepted the respective Debtor's plan; or

              (2)      will receive or retain under such plan on account of such claim or interest property of a value, as of the Effective Date of such plan, that is not less than the amount that such holder would so receive or retain if such Debtor was liquidated under Chapter 7 of the Bankruptcy Code on such date; or

        (ii)     if §1111(b)(2) of the Bankruptcy Code applies to the claims of such class, the holder of a claim of such class will receive or retain under the Joint Plan on account of such claim property of a value as of the Effective Date, that is not less than the value of such holder's interest in the estate's interest in the property that secured such claims.

(h)      With respect to each class of claims or interests:

        (i)      such class has accepted the respective Debtor's plan; or

        (ii)     such class is not impaired under the plan.

(i)      Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

        (i)      with respect to a claim of a kind specified in § 507(a)(2) or § 507(a)(3) of the Bankruptcy Code, on the Effective Date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

        (ii)     with respect to a class of claims of a kind specified in §§ 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7) of the Bankruptcy Code, each holder of a claim of such class will receive:

              (1)      if such class has accepted the respective Debtor's plan, deferred cash payments of a value, as of the Effective Date of such plan, equal to the allowed amount of such claim; or

(2)    if such class has not accepted the respective Debtor's plan, cash on the effective date of the such plan equal to the allowed amount of such claim; and

(iii)    with respect to a claim of a kind specified in § 507(a)(8) of the Bankruptcy Code, the holder of a claim will receive on account of such claim regular installment payments in cash—

(1)    of a total value, as of the effective date of the paln, equal to the allowed amount of such claim;

(2)    over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and

(3)    in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122 (b)); and

(iv)    with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in subparagraph (iii).

(j)    If a class is impaired under the respective Debtor's plan, at least one class of claims that is impaired has accepted the such plan, determined without including any acceptance of the plan by any insider.

(k)    Confirmation of the Joint Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Plan Proponents or any successor to the Plan Proponents under the Joint Plan, unless such liquidation or reorganization is proposed in the Joint Plan.

The Debtors believe that the Joint Plan satisfies all the statutory requirements of Chapter 11 of the Bankruptcy Code, that it has complied or will have complied with all of the requirements of Chapter 11, and that the proposal of the Joint Plan is made in good faith.

Because the Plan proposes to satisfy all Allowed Claims in full, the Debtors believe that the holders of all Claims and Equity Interest impaired under the Joint Plan will receive payments

or distributions under the Joint Plan having a present value as of the Effective Date in amounts not less than the amounts likely to be received by such holders if each Debtor was liquidated in a case under Chapter 7 of the Bankruptcy Code.

Finally, the Debtors believe that the confirmation of the Joint Plan is not likely to be followed by the liquidation or the need for further financial reorganization of either of the Debtors.

### J.   Cramdown.

In the event that any impaired class of Claims and Equity Interests does not accept either La Bota's or Rock Tech's  plan, the Bankruptcy Court may still confirm such plan if, as to each impaired class, which has not accepted such plan, the plan does not discriminate "unfairly" and is "fair and equitable."  A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for its, claims or equity interests.

"Fair and equitable" has different meanings with respect to the treatment of secured and unsecured claims.  As set forth in § 1129(b)(2) of the Bankruptcy Code, those meanings are as follows:

1.   With respect to a class of secured claims, the plan provides:

(a)   (i)   that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the Plan Proponent or transferred to another entity, to the extent of the allowed amount of such claims; and

(ii)   that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(b)   for the sale, subject to § 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) and (b) of this subparagraph; or

(c)   for the realization by such holders of the indubitable equivalent of such claims.

2.   With respect to a class of unsecured claims, the plan provides:

(a)   that each holder of a claim of such class receive or retain on

account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(b)     the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

3.     With respect to a class of interests, the plan provides:

(a)     that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

(b)     the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

The Bankruptcy Court will determine at the Confirmation Hearing whether La Bota's plan and Rock Tech's plan is fair and equitable with respect to, and does not discriminate unfairly against any rejecting impaired class of Claims and Equity Interests. The Debtors believe that the Bankruptcy Court will find these requirements satisfactory and will confirm the Joint Plan.

**K.     *Retention of Jurisdiction by Bankruptcy Court.***

After the Effective Date of the Joint Plan, the Bankruptcy Court will continue to have jurisdiction over all matters arising under, arising out of or relating to these cases.  Such jurisdiction will be exercised to (a) insure that the purpose and intent of the Joint Plan are carried out; (b) consider any modification of the Joint Plan under Section 1127 of the Bankruptcy Code before substantial consummation as defined in Section 1101(2) of the Bankruptcy Code; (c) hear and determine all Claims, controversies, suits, and disputes against the Debtors; (d) hear and determine all Objections to Claims, controversies, suits and disputes that may be pending at or initiated after the Effective Date; (e) classify the Claims of any creditor and to re-examine Claims which have been allowed for purposes of voting, and to determine Objections which may be filed to Claims; (f) hear, adjudicate, determine, and enforce claims and causes of action which may exist on behalf of either Debtor or their estate; (g) consider and act on the compromise and settlement of any Claim against or cause of action on behalf of the Debtors or their estate; (h) hear and determine all controversies, suits, and disputes that may arise in connection with the interpretation, execution, or enforcement of the Joint Plan; (i) hear and determine all requests for compensation and/or reimbursement of expenses for services rendered or expenses incurred prior to the Effective Date which may be made after the Effective Date of the Joint Plan; (j) enforce and interpret by injunction or otherwise the terms and conditions of the Joint Plan; (k) adjudicate any and all disputes regarding ownership and other rights regarding La Bota's, Rock Tech's and/or the Reorganized Debtors' assets; (l) enter an order closing the Jointly Administered

Chapter 11 Cases; (m) correct any defect, cure any omission, or reconcile any inconsistency in the Joint Plan or Confirmation Order which may be necessary or helpful to carry out the purposes and intent of the Joint Plan; (n) consider any and all actions taken to enforce the terms of or to collect on any of the indebtedness described herein on either the Debtors or any other related party; and (o) consider and act on such other matters consistent with the Joint Plan as may be provided in the Confirmation Order.

### L.   *Miscellaneous Provisions.*

#### 1.   **Compliance with Law.**

The Joint Plan mandates compliance by La Bota, Rock Tech, and any other person charged with carrying out any provisions of the Joint Plan with all withholding and reporting requirements imposed by federal, state and local taxing authorities, and all distributions under the Joint Plan will be subject to such withholding and reporting requirements. In addition, the Joint Plan requires that La Bota and/or Rock Tech, if notified by any governmental authority that either is in violation of any applicable law, rule, regulation, or order of such governmental authority relating to its business, comply with such law, rule, regulation or order, unless the legality or applicability of such requirement is being contested in good faith in an appropriate proceeding and, if appropriate, an adequate reserve has been set aside. Finally, all fees payable pursuant to Section 1930 of Title 28 of the United States Code, will be paid on or before the Effective Date.

#### 2.   **Modification, Revocation and Severability Rights.**

The Debtors may modify the Joint Plan at any time before confirmation, provided that the requirements of §§ 1122, 1123 and 1125 are satisfied with respect to the modification. After confirmation and before substantial consummation of the Joint Plan, modifications to the Joint Plan may be made by the Debtors to the extent permitted by Sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, may confirm the Joint Plan under Section 1129 of the Bankruptcy Code, as modified.

If La Bota's plan is withdrawn or revoked by La Bota, or if confirmation of La Bota's plan does not occur, then such plan will be deemed null and void. If Rock Tech's plan is withdrawn or revoked by Rock Tech, or if confirmation of Rock Tech's plan does not occur, then such plan will be deemed null and void.

### M.   *Each Debtor's plan is independent.*

While in the interest of convenience for all creditors and parties-in-interest, La Bota and Rock Tech seek to confirm a Joint Plan, because each Debtor's bankruptcy is jointly administered confirmation of each Debtor's plan is independent of the confirmation of the other Debtor's plan. Thus, a default under one Debtor's plan shall not cause a default under the other Debtor's plan.

### N.   *Liquidation Analysis.*

As demonstrated in the Joint Plan, the Debtors propose to pay all of their creditors in full. As such, the analysis typically required 11 U.S.C. § 1129(7)(A) is not necessary because the Debtors are proposing to pay all Claims holders the amount of the Allowed Claim. However, attached are the Debtors' Schedules listing their assets and liabilities.

*O.*    *Risk Factors.*

Both failure to achieve confirmation of the Joint Plan, and consummation of the Joint Plan, are subject to a number of risks. In addition, there are certain risks inherent in the reorganization process under the Bankruptcy Code. If certain standards set forth in the Bankruptcy Code are not met, the Bankruptcy Court will not confirm the Joint Plan even if Creditors accept the Joint Plan. Although the Debtors believe that the Joint Plan meets such standards, there can be no assurance that the Bankruptcy Court will reach the same conclusion. If the Bankruptcy Court were to determine that such requirements were not met, it could require the Debtor or Debtors to re-solicit acceptances, which could delay and/or jeopardize confirmation of the Joint Plan. The Debtors believe that the solicitation of votes on the Joint Plan will comply with Section 1126(b) and that the Bankruptcy Court will confirm the Joint Plan. The Debtors, however, can provide no assurance that modifications of the Joint Plan will not be required to obtain confirmation of the Joint Plan, or that such modifications will not require a re-solicitation of acceptances.

## ARTICLE XVI – FEDERAL INCOME TAX CONSEQUENCES

**THE FOLLOWING DISCUSSION IS A SUMMARY OF CERTAIN SIGNIFICANT FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO THE DEBTORS AND TO HOLDERS OF CLAIMS AND EQUITY INTERESTS AND IS BASED ON THE INTERNAL REVENUE CODE OF 1986 (TITLE 26, UNITED STATES CODE), AS AMENDED TO THE DATE HEREOF (THE "TAX CODE"), TREASURY REGULATIONS PROMULGATED AND PROPOSED THEREUNDER, JUDICIAL DECISIONS AND PUBLISHED ADMINISTRATIVE RULES AND PRONOUNCEMENTS OF THE IRS AS IN EFFECT ON THE DATE HEREOF. CHANGES IN SUCH RULES OR NEW INTERPRETATIONS THEREOF COULD SIGNIFICANTLY AFFECT THE TAX CONSEQUENCES DESCRIBED BELOW. NO RULINGS HAVE BEEN REQUESTED FROM THE IRS. MOREOVER, NO LEGAL OPINIONS HAVE BEEN REQUESTED FROM COUNSEL WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN.**

**THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN TO THE HOLDERS OF CLAIMS AND EQUITY INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. IN ADDITION, THIS DISCUSSION DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTORS OR THE HOLDERS OF ALLOWED CLAIMS OR EQUITY INTERESTS (SUCH AS HOLDERS WHO DO NOT ACQUIRE THEIR CLAIM ON ORIGINAL ISSUE), NOR DOES THE DISCUSSION DEAL WITH TAX ISSUES PECULIAR TO CERTAIN TYPES OF TAX**

PAYERS (SUCH AS DEALERS IN SECURITIES, S CORPORATIONS, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, TAX-EXEMPT ORGANIZATIONS AND FOREIGN TAXPAYERS). NO ASPECT OF FOREIGN, STATE, LOCAL OR ESTATE AND GIFT TAXATION IS ADDRESSED.

THE FOLLOWING SUMMARY IS, THEREFORE, NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR EQUITY INTEREST. HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES PECULIAR TO THEM UNDER THE PLAN. THE DEBTORS ASSUME NO RESPONSIBILITY FOR THE TAX EFFECT THAT CONFIRMATION AND RECEIPT OF ANY DISTRIBUTION UNDER THE PLAN MAY HAVE ON ANY GIVEN CREDITOR OR OTHER PARTY IN INTEREST.

No administrative rulings will be sought from the Internal Revenue Service (hereinafter **"IRS"**) with respect to any of the federal income tax aspects of the Plan. Consequently, there can be no assurance that the treatment described in this Disclosure Statement will be accepted by the IRS. No opinion of counsel has either been sought or obtained with respect to the federal income tax aspects of the Plan.

### A.    *IRS Circular 230 Disclosure*

THIS DISCLOSURE STATEMENT IS WRITTEN TO SUPPORT THE PROMOTION OR THE MARKETING OF TRANSACTIONS DISCUSSED HEREIN. TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, THE DEBTORS ARE INFORMING YOU THAT THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES THAT MAY BE IMPOSED ON SUCH TAXPAYER UNDER THE TAX CODE. TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

### B.    *Consequences to Holders of Claims*

#### 1.    Realization and Recognition of Gain or Loss in General

The federal income tax consequences of the implementation of the Plan to a Holder of a Claim will depend, among other things, upon the origin of the Holder's Claim, when the Holder's Claim becomes an Allowed Claim, when the Holder received payment in respect of such Claim, whether the Holder reports income using the accrual or cash method of accounting, whether the Holder has taken a bad debt deduction or worthless security deduction with respect to such claim, whether the Claimant receives consideration in more than one tax year of the Claimant, whether the Claimant is a resident of the United States, whether all the consideration received by the Claimant is deemed to be received by that Claimant in an integrated transaction and whether the Holder's Claim constitutes a "security" for federal income tax purposes.

Generally, a Holder of an Allowed Claim will realize gain or loss on the exchange under the Plan of its Allowed Claim for stock and other property (such as Cash and new debt instruments), in an amount equal to the difference between (i) the sum of the amount of any Cash and the issue price of any debt instrument (other than any consideration attributable to a Claim for accrued but unpaid interest), and (ii) the adjusted basis of the Allowed Claim exchanged therefore (other than basis attributable to accrued but unpaid interest previously included in the Holder's taxable income).   The treatment of accrued but unpaid interest and amounts allocable thereto varies depending on the nature of the Holder's claim, such as (i) the nature and origin of the Claim; (ii) the tax status of the holder of the Claim; (iii) whether the holder is a financial institution; (iv) whether the Claim is a capital asset in the hands of the holder; (v) whether the Claim has been held for more than one (1) year; (vi) the extent to which the holder previously claimed a loss, bad debt deduction or charge to a reserve for bad debts with respect to the Claim, and is discussed below.

Whether or not such realized gain or loss will be recognized (*i.e.*, taken into account) for federal income tax purposes will depend in part upon whether such exchange qualifies as a recapitalization or other 'reorganization" as defined in the Tax Code, which may in turn depend upon whether the Claim exchanged is classified as a "security" for federal income tax purposes. The term "security" is not defined in the Tax Code or in the Treasury Regulations.  One of the most significant factors considered in determining whether a particular debt instrument is a security is the original term thereof.  In general, the longer the term of an instrument, the greater the likelihood that it will be considered a security.  As a general rule, a debt instrument having an original term of 10 years or more will be classified as a security, and a debt instrument having an original term of fewer than five years will not.  Debt instruments having a term of at least five years but less than 10 years are likely to be treated as securities, but may not be, depending upon their resemblance to ordinary promissory notes, whether they are publicly traded, whether the instruments are secured, the financial condition of the debtor at the time the debt instruments are issued, and other factors.  Each Holder of an Allowed Claim should consult his or her own tax advisor to determine whether his or her Allowed Claim constitutes a security for federal income tax purposes.

### 2.      Accrued Interest

The Debtors intend to take the position that all payments in respect of Allowed Claims will be first allocated to the principal amount of the Allowed Claim, with any excess allocated to accrued unpaid interest.  However, there is no assurance that such allocation would be respected by the IRS for federal income tax purposes.  In general, to the extent any amount received by a Holder of an Allowed Claim is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the Holder as interest income (if not previously included in the Holder's gross income).  Conversely, a Holder generally will recognize a deductible loss to the extent any accrued interest claimed was previously included in gross income and is not paid in full.  Each Holder of an Allowed Claim is urged to consult its tax advisor regarding the allocation of consideration and deductibility of unpaid interest for tax purposes.

A Holder, who, under its accounting method, was not previously required to include in income, accrued but unpaid interest attributable to its existing Claims, and who exchanges its interest Claim for cash, or other property, pursuant to the Plan will be treated as receiving ordinary interest income to the extent of any consideration so received allocable to such interest, regardless of whether that Holder realizes an overall gain or loss as a result of the exchange of its existing Claims.

### 3. Withholding

All distributions to Holders of claims under the Plan are subject to any applicable withholding. Under federal income tax law, interests, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at a 28% rate. Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number ("***TIN***"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

### C. Consequences to Debtors or Reorganized Debtors - Discharge of Indebtedness Income Generally

In general, the discharge of a debt obligation by a debtor for an amount less than the adjusted issue price (generally, the amount received upon incurring the obligation plus the amount of any previously amortized original issue discount and less the amount of any previously amortized bond issue premium) gives rise to cancellation of indebtedness ("***COD***") income which must be included in a debtor's income for federal income tax purposes, unless, in accordance with section 108(e)(2) of the Tax Code, payment of the liability would have given rise to a deduction. A corporate debtor that issues its own stock or its own debt in satisfaction of its debt is treated as realizing COD income to the extent the fair market value of the stock or the issue price of new debt issued is less than the adjusted issue price of the old debt. COD income is not recognized by a taxpayer that is a debtor in a title 11 (bankruptcy) case if a discharge is granted by the Bankruptcy Court or pursuant to a plan approved by the Bankruptcy Court (the "***Bankruptcy Exclusion Rules***").

The Debtors have not determined if any COD income will be realized pursuant to the Plan, but believes that the COD income, if any, will not be recognized by the Debtors due to the Bankruptcy Exclusion rules. However, the Debtors, as a result of the exception, may be subject to a reduction of certain of its "tax attributes" to the extent that COD income is not recognized under the Bankruptcy Exclusion Rules. Thus, while the Debtors will not recognize taxable income from discharge of indebtedness, they may experience reductions in (i) any net operating losses ("***NOL***") that have accumulated, (ii) the tax basis of its property, and (iii) other tax attributes, as set forth in section 108(b)(2) of the Tax Code.

Nothing herein shall be construed as advice to Reorganized La Bota or Reorganized Rock Tech; the Reorganized Debtors are relying solely on their own counsel for such advice.

## ARTICLE XVII – EXHIBITS TO DISCLOSURE STATEMENT

EXHIBIT 1 – La Bota Development Company, Inc. – Excerpts from Schedules

EXHIBIT 2 – La Bota Development Company, Inc.'s Monthly Operating Reports

EXHIBIT 3 – La Bota Development Company, Inc.'s Responses to Question Number Three on the Statement of Financial Affairs

EXHIBIT 4 – Laredo Rock Tech Sand & Gravel, LP – Excerpts from Schedules

EXHIBIT 5 – Laredo Rock Tech Sand & Gravel, LP's Monthly Operating Reports

EXHIBIT 6 – Laredo Rock Tech Sand & Gravel, LP's Responses to Question Number Three on the Statement of Financial Affairs

EXHIBIT 7 – Property Map

EXHIBIT 8 – La Bota's Assumed Executory Contracts and Unexpired Leases

EXHIBIT 9 – Rock Tech's Assumed Executory Contracts and Unexpired Leases

EXHIBIT 10 – Joint Plan of Reorganization

EXHIBIT 11 – Appraisals

## ARTICLE XVIII – CONCLUSION

The Debtors believe that the Joint Plan will provide an opportunity for creditors of the Debtors to receive more than would be received if each of the cases was liquidated in a case under Chapter 7 of the Bankruptcy Code.  Accordingly, the Debtors urge you to vote in favor of the Joint Plan.

Signed this 31st day of August, 2010.

Respectfully submitted,

**LA BOTA DEVELOPMENT COMPANY, INC.**

By: _/s/ Albert F. Muller III_ _____
        Albert F. Muller III, President

**LAREDO ROCK TECH SAND & GRAVEL, LP**

By: _/s/ Albert F. Muller III_ _____
        Albert F. Muller III, Sole Managing
        Member of Mariposa Group, LLC, a Texas
        Limited Liability Company, being the Sole
        General Partner of Laredo Rock Tech Sand
        & Gravel, LP.

**APPROVED:**

_/s/ Wayne Kitchens_ _____
Wayne Kitchens          TBN 11541110
wkitchens@hwa.com
Steven Shurn            TBN 24013507
sshurn@hwa.com
Simon Mayer             TBN 24060243
smayer@hwa.com
**HUGHESWATTERSASKANASE, LLP**
333 Clay Street, 29th Floor
Houston, Texas 77002
Tel: 713.759.0818
Fax: 713.759.6834
**COUNSEL FOR DEBTORS**